**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LEADAWN FERGUSON, | : | |
| | : | |
| Plaintiff, | : | **CIVIL ACTION** |
| | : | |
| v. | : | **No. 14-_____** |
| | : | |
| UNITED STATES OF AMERICA; CBP/ICE | : | **JURY TRIAL DEMANDED** |
| AGENT LAMANSKI; CBP/ICE AGENT | : | |
| TANDARIC; CBP/ICE AGENT REYNOLDS; | : | |
| CBP/ICE AGENT DOES 1-5; RAJ K. | : | |
| GHIMIRE, MD; DEREK L. ISENBERG, MD; | : | |
| MAURA E. SAMMON, MD; NURSE TARA | : | |
| CHOWDHURY; NURSE STACEY | : | |
| RUTLAND; NURSE NATALIE TRABOSCIA; | : | |
| MEDICAL PROVIDER AND HOSPITAL | : | |
| STAFF DOES 6-10; MERCY FITZGERALD | : | |
| HOSPITAL; MERCY HEALTH SYSTEM, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## COMPLAINT

## I. PRELIMINARY STATEMENT

1.      In December 2012, Plaintiff LeaDawn Ferguson, a 36-year-old African-American citizen of the United States, went to the Dominican Republic for a short vacation.  When she returned to the United States on December 4, 2012 via Philadelphia International Airport, U.S. Customs and Border Protection ("CBP") and U.S. Immigration and Customs Enforcement ("ICE") agents accused her of being a "drug packer" – that is, someone who ingested controlled substances to transport them into the United States without detection.

2.      The agents had no basis for their suspicion of Ms. Ferguson.  Indeed, Ms. Ferguson had done nothing wrong and was, in fact, not transporting any contraband into the United States.

3.      Notwithstanding the lack of legally sufficient suspicion, the agents whom Ms. Ferguson encountered detained her, unreasonably searched her and, shockingly, transported her—without her consent—to Mercy Fitzgerald Hospital (the "Hospital") in Darby, Pennsylvania.

4.      Upon arrival at the Hospital, medical personnel employed by the Hospital, acceded to the wishes of the government agents who had taken Ms. Ferguson into custody, and, despite their knowledge that there was no legal basis on which to detain her, proceeded to conduct ongoing invasive medical testing.

5.      Medical personnel at the Hospital, without Ms. Ferguson's consent, placed her in restraints, inserted an intravenous catheter in her arm, injected her with medication intended to sedate her, conducted a thorough physical examination—including the removal of a tampon from Ms. Ferguson's vagina and the drawing of a urine sample using a catheter—and subjected her to radiological examinations, including X-rays and a CT scan.

6.      After completion of these and other examinations, medical personnel confirmed what Ms. Ferguson had told the CBP and/or ICE agents from the moment she encountered them: that she had no contraband on her person.

7.      Finally, approximately 24 hours after her flight arrived in Philadelphia, Ms. Ferguson was freed and allowed to begin traveling to her home in Maryland.  En route to her home, however, due to her extreme distress as a result of her unlawful detention and the nonconsensual medical procedures performed on her, and as a result of the sedating medications that were forcibly injected into her, Ms. Ferguson had a car accident, causing physical injury to herself and damage to her car.

8.     As a result of her experiences at the hands of the CBP and/or ICE agents and medical personnel at the Hospital, Ms. Ferguson has suffered extraordinary damages, including extreme emotional distress and trauma, embarrassment and anxiety.

9.     Accordingly, Ms. Ferguson seeks compensation for her extensive damages.  Ms. Ferguson brings claims against the United States under the Federal Tort Claims Act, against the CBP and/or ICE agents under the United States Constitution pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and against the Hospital, medical personnel and their employers under the United States Constitution and Pennsylvania state law.

## II.  JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this Complaint under the United States Constitution and 28 U.S.C. §§ 1331, 1346(b), and 1367.

11.     On or about May 16, 2014, Ms. Ferguson submitted an Administrative Tort Claim to the U.S. Department of Homeland Security ("DHS") and two of its agencies: U.S. Customs and Border Protection ("CBP") and U.S. Immigration and Customs Enforcement ("ICE").  As of the filing of this Complaint on December 1, 2014, neither DHS, CBP nor ICE had responded to the Administrative Tort Claim, and the failure of these agencies to do so constitutes a final denial of the claim under 28 U.S.C. § 2675(a).

12.     Venue is proper in this District under 28 U.S.C. § 1402(b) as the actions at issue in this matter occurred in Philadelphia, Pennsylvania and Darby, Pennsylvania, both of which are located within the Eastern District of Pennsylvania.

### III.  PARTIES

13.     Plaintiff LeaDawn Marie Ferguson ("Ms. Ferguson"), was at all times relevant to this Complaint a resident of Greensboro, North Carolina.

14.     Defendant United States of America is the appropriate defendant under the Federal Tort Claims Act.

15.     Defendant Agent Lamanski was at all times relevant to this Complaint employed as an agent of CBP and/or ICE and assigned to the Philadelphia International Airport in Philadelphia, Pennsylvania.  S/he is sued in his/her individual capacity.

16.     Defendant Agent Tandaric was at all times relevant to this Complaint employed as an agent of CBP and/or ICE and assigned to the Philadelphia International Airport in Philadelphia, Pennsylvania.  S/he is sued in his/her individual capacity.

17.     Defendant Agent Reynolds was at all times relevant to this Complaint employed as an agent of CBP and/or ICE and assigned to the Philadelphia International Airport in Philadelphia, Pennsylvania.  S/he is sued in his/her individual capacity.

18.     Defendant Agent Does 1-5 were at all times relevant to this Complaint employed as supervisors and/or agents of CBP and/or ICE and assigned to the Philadelphia International Airport in Philadelphia Pennsylvania.  Each is sued in his/her individual capacity.

19.     At all times relevant to this Complaint, defendants Lamanski, Tandaric, Reynolds and Agent Does 1-5 were acting within the scope and course of their employment with DHS, CBP and/or ICE and were acting as investigative and/or law enforcement officers.

20.     Defendant Mercy Fitzgerald Hospital ("the Hospital") is an acute-care hospital in Darby, Pennsylvania and a part of Defendant Mercy Health System ("MHS").  Both defendants

are vicariously liable to Ms. Ferguson as the employers of the below identified medical personnel.

21.     Defendant Raj K. Ghimire, MD, was at all times relevant to this Complaint employed as a physician by MHS and/or the Hospital.

22.     Defendant Derek L. Isenberg, MD, was at all times relevant to this Complaint employed as a physician by MHS and/or the Hospital.

23.     Defendant Maura E. Sammon, MD, was at all times relevant to this Complaint employed as physician by MHS and/or the Hospital.

24.     Defendant Tara Chowdhury was at all times relevant to this Complaint employed as a nurse by MHS and/or the Hospital.

25.     Defendant Stacey Rutland was at all times relevant to this Complaint employed as a nurse by MHS and/or the Hospital.

26.     Defendant Natalie Traboscia was at all times relevant to this Complaint employed as a nurse by MHS and/or the Hospital.

27.     Defendant Does 6-10 were at all times relevant to this Complaint employed by MHS and/or the Hospital.

28.     At all times relevant to this Complaint, defendants Ghimire, Isenberg, Sammon, Chowdhury, Rutland, Traboscia and Does 6-10 were acting within the scope and course of their employment with MHS and/or the Hospital.

29.     At all times relevant to this Complaint, all defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to Ms. Ferguson.

## IV.  FACTUAL ALLEGATIONS

30.     On December 4, 2012, Ms. Ferguson, then 36-years-old, flew home to the U.S. via the Philadelphia International Airport after having taken a short vacation to Punta Cana, Dominican Republic.

31.     Punta Cana is a popular destination for U.S. tourists vacationing in the Caribbean.

32.     Ms. Ferguson's brother is an airline employee, which allows her to purchase airline tickets for international air travel with a "family and friends" discount, a benefit that Ms. Ferguson frequently used.

33.     Ms. Ferguson had used such a discount fare to take her vacation to Punta Cana.

34.     After deplaning at the Philadelphia International Airport, Ms. Ferguson cleared customs, had her passport stamped, and retrieved her luggage.

35.     While making her way to an airport exit, she was stopped by a uniformed officer. The officer examined her documentation and, without any explanation, then sent Ms. Ferguson to a secondary screening area.

36.     Multiple CBP and/or ICE agents, including defendants Lamanski, Tandaric, Reynolds and Agent Does 1-5 ("CBP/ICE defendants") then interrogated Ms. Ferguson regarding her trip.

37.     Ms. Ferguson informed the CBP/ICE defendants that her brother's "friends and family" discount fares from his employer occasionally allowed her to travel abroad, often for short trips.

38.     At no time did the CBP/ICE defendants contact the airline to confirm her brother's employment status or make any other effort to verify Ms. Ferguson's statements.

39.     During the interrogation, the CBP/ICE defendants examined Ms. Ferguson's personal property, including her paycheck stubs, social security card, passport, and driver's license and repeatedly searched her luggage and purse.

40.     The CBP/ICE defendants informed Ms. Ferguson that they suspected her of transporting drugs into the United States.

41.     Ms. Ferguson denied any knowledge of or involvement in transporting drugs.

42.     The CBP/ICE defendants, in an apparent effort to shame Ms. Ferguson for her perceived illegal conduct and to persuade her to falsely admit to transporting drugs, asked her if she had any children or if she was religious.

43.     The CBP/ICE defendants asked Ms. Ferguson to submit to a pat down.

44.     Ms. Ferguson asked whether she was under arrest; she was told that she was not, and she refused the pat down.

45.     Although Ms. Ferguson was told that she was not under arrest, the CBP/ICE defendants would not allow her to leave the airport.

46.     In response to Ms. Ferguson's refusal to submit to a pat down, the CBP/ICE defendants told Ms. Ferguson that if she submitted to a pat down, they would apologize and release her.

47.     Based solely on the CBP/ICE defendants' assertions, Ms. Ferguson then agreed to be patted down by a female agent.

48.     Ms. Ferguson was moved to a small room resembling a jail cell where the pat down was conducted by a female CBP/ICE defendant.  The agent found no drugs or other contraband on Ms. Ferguson's person.

49.     Despite the promise made before the pat down, the CBP/ICE defendants did not release Ms. Ferguson after the pat down.

50.     Instead, one of the male CBP/ICE defendants continued interrogating Ms. Ferguson in the jail cell.

51.     Throughout the prolonged interrogation, Ms. Ferguson repeatedly requested that she be permitted to call an attorney, but her requests were denied.

52.     After approximately seven hours of interrogation, the CBP/ICE defendants presented Ms. Ferguson with a consent form that would authorize them to take her to a hospital where she would be subjected to medical procedures to search for drugs inside of her body.

53.     The CBP/ICE defendants demanded that she sign the consent form.

54.     Ms. Ferguson refused to sign the consent form without consulting an attorney.

55.     The CBP/ICE defendants continued to deny her requests to consult with an attorney and also refused to release her.

56.     Ms. Ferguson did not sign the consent form or otherwise agree to be transferred to a hospital for any purpose.

57.     Despite her lack of resistance, the CBP/ICE defendants then forcibly handcuffed and shackled Ms. Ferguson.  They also taped her pant legs tightly around each of her ankles.

58.     After restraining Ms. Ferguson, the CBP/ICE defendants dragged her through the airport to an exit.

59.     Ms. Ferguson was placed in the back seat of a marked law enforcement vehicle. After approximately 20 minutes of travel in the vehicle, the CBP/ICE defendants unloaded Ms. Ferguson from the vehicle in front of the Hospital in Darby, Pennsylvania.

60.     The CBP/ICE defendants dragged Ms. Ferguson, still restrained in handcuffs and shackles, into the Hospital in front of dozens of on-lookers.

61.     Ms. Ferguson arrived at the Hospital at or around 3:24 a.m. on December 5, 2012.

62.     Hospital staff prepared records for Ms. Ferguson indicating that she had been brought in by law enforcement agents for "possible body packing."

63.     Upon Ms. Ferguson's arrival at the Hospital, defendant Traboscia, who was working as a triage nurse, assessed Ms. Ferguson.

64.     Defendant Traboscia noted in Hospital records that Ms. Ferguson refused medical treatment.

65.     Further, defendant Traboscia noted that Ms. Ferguson appeared to have no medical issues consistent with "body packing"; specifically, defendant Traboscia observed that Ms. Ferguson was breathing without difficulty, that her speech was coherent and that she exhibited no neurological deficits.

66.     The CBP/ICE defendants and Hospital medical staff demanded that Ms. Ferguson sign a form consenting to medical treatment and services.

67.     Knowing she had done nothing that justified her confinement or forced medical assessment and that her previous agreement to submit to a pat down had not resulted in her release as promised, Ms. Ferguson refused to sign the consent form.

68.     Notwithstanding the lack of any signs or symptoms of medical issues related to "body packing," Ms. Ferguson was, at some point, placed in an inpatient room.

69.     One of the CBP/ICE defendants remained in the room with Ms. Ferguson while two others guarded the door.

70.     The CBP/ICE defendants told Ms. Ferguson that she was required to remain in the room until she had urinated and defecated into a plastic container in the presence of an officer.

71.     After her placement in an inpatient room, defendants Derek Isenberg, MD and Nurse Tara Chowdhury were assigned by the Hospital to assess Ms. Ferguson.

72.     After several hours of being held in the room, Ms. Ferguson overheard a member of the Hospital staff express concern that the CBP/ICE agents did not have a warrant to search her and stated that the Hospital staff could not x-ray or otherwise examine Ms. Ferguson without her consent or a warrant.

73.     Defendants Isenberg and Chowdhury were aware that Ms. Ferguson refused treatment and, likewise, knew that Ms. Ferguson displayed no signs or symptoms of medical issues consistent with "body packing."

74.     Defendants Isenberg and Chowdhury were further aware that the CBP/ICE defendants did not have a warrant to detain and/or search Ms. Ferguson.

75.     Notwithstanding their knowledge of these facts, defendants Isenberg and Chowdhury took no action to ensure Ms. Ferguson's release from the Hospital and instead permitted the CBP/ICE defendants to continue detaining her against her will.

76.     At a shift change in the morning hours of December 5, 2012, the Hospital transferred responsibility for Ms. Ferguson's assessment to defendants Raj K. Ghimire, MD, Maura Sammon, MD, and Nurse Stacey Rutland.

77.     Defendant Rutland began speaking to Ms. Ferguson about her medical status while the CPB/ICE defendants were present.

78.     Ms. Ferguson made clear to defendant Rutland that, because the CPB/ICE defendants had detained her against her will for hours, she did not wish to discuss any medical information, or to be assessed, in the presence of the CPB/ICE defendants.

79.     Based on her assessment, defendant Rutland concluded that Ms. Ferguson showed signs of tachycardia—an elevated heart rate.

80.     Ms. Ferguson's elevated heart rate was caused by the fact that she had been detained against her will, subjected to prolonged and hostile interrogations, forcibly hand-cuffed and shackled, and denied access to rest, food and water for hours.

81.     Notwithstanding this obvious explanation for Ms. Ferguson's elevated heart rate, at or around 12:30 p.m. on December 5, 2012, defendant Ghimire admitted her to the Hospital based on her "tachychardia" and "possible drug toxicity."

82.     After Ms. Ferguson's admission to the Hospital, defendant Sammon entered the guarded room and told Ms. Ferguson that she wanted to conduct an examination because her heart rate was elevated.

83.     Ms. Ferguson told defendant Sammon that she was sure her heart rate was elevated because she was experiencing stress from being detained against her will and because she had not eaten, had anything to drink, or slept in hours.

84.     The CBP/ICE defendants told defendant Sammon that they were "in the process" of obtaining a warrant to search Ms. Ferguson's person.

85.     Defendant Sammon noted in Ms. Ferguson's medical record that Ms. Ferguson was "allowed"  to "refuse" care because the CBP/ICE defendants were waiting for a warrant.

86.     However, the CBP/ICE defendants never obtained a warrant to permit any medical examination or assessment of Ms. Ferguson.

87.     Notwithstanding the CBP/ICE defendants' failure to obtain a warrant, and the logical explanation for Ms. Ferguson's elevated heart rate given her prolonged detention and lack of food and fluids, defendant Sammon, at some point on December 5, 2012, made the decision to involuntarily commit Ms. Ferguson pursuant to 50 P.S. § 7302, claiming that Ms. Ferguson purportedly presented a harm to herself.

88.     Given the circumstances of Ms. Ferguson's detention at the Hospital, the CBP/ICE defendants' failure to obtain a warrant and the lack of demonstrated medical need for an involuntary commitment, defendant Sammon's decision to pursue involuntary commitment was willfully and intentionally improper and grossly negligent.

89.     Upon information and belief, the CBP/ICE defendants, in order to avoid the need to obtain a warrant, demanded that defendant Sammon involuntarily commit Ms. Ferguson.

90.     As a result of her decision to involuntarily commit Ms. Ferguson, defendant Sammon reached the conclusion that she and other Hospital staff were authorized to conduct an examination of Ms. Ferguson and to provide emergency treatment, all without a warrant or Ms. Ferguson's consent.

91.     After defendant Sammon involuntarily committed Ms. Ferguson, a number of male Hospital staff members entered the room, and, at the direction of medical staff, forcefully seized Ms. Ferguson and tied her down to a hospital bed with restraints.

92.     After restraining her, the male staff members exited the room and a female medical staff member entered and stripped Ms. Ferguson of all her clothing, including her undergarments, by cutting them off of her body with shears and/or forcefully removing them— all in the presence of a male CBP/ICE defendant.

93.     After Ms. Ferguson had been stripped naked, the male CBP/ICE defendant, subjected Ms. Ferguson's naked body, including her vulva and vagina, to close visual inspection.

94.     Ms. Ferguson asked the CBP agent to stop and to leave the room, but he told Ms. Ferguson, "I have daughters," and refused to look away from her exposed body.

95.     Defendant Sammon conducted a thorough physical examination of Ms. Ferguson, which included removing a tampon from her vagina.

96.     After Ms. Ferguson was restrained, defendant Rutland, on the orders of defendant Sammon, injected an intravenous (IV) catheter into Ms. Ferguson's arm.

97.     Defendant Rutland then proceed to administer two medications to Ms. Ferguson, as ordered by defendant Sammon.

98.     First, defendant Rutland administered intravenoulsy two milligrams of lorazepam, a psychoactive benzodiazepine drug commonly used to sedate patients.

99.     Second, defendant Rutland administered an intramuscular injection of ten milligrams of olanzapine, an antipsychotic drug used to treat psychotic mental disorders, such as schizophrenia or bipolar disorder.

100.    These medications had an anesthetic like effect on Ms. Ferguson, rendering her sedated and temporarily unaware of her surroundings.

101.    There was no medical basis for the administration of these medications and Ms. Ferguson did not consent to it.

102.    The administration of these medications was intended to aid the CBP/ICE defendants in their investigation of Ms. Ferguson's allegedly unlawful conduct.

103.    Before she was administered the medications, medical staff did not warn or otherwise advise Ms. Ferguson of any of the medical risks of the medications.

104.     Nor did Hospital staff confirm whether Ms. Ferguson was taking any medication that could potentially cause a drug interaction with the medications administered to her.

105.     In addition to ordering the administration of medications intended to sedate Ms. Ferguson, defendant Sammon placed numerous orders for medical procedures and tests, including an electrocardiogram, X-ray studies, abdominal and pelvic computed tomography ("CT") scans, catheterization for urine collection, and a battery of blood tests.

106.     At or about 12:17 p.m. on December 5, 2012, the electrocardiogram study defendant Sammon ordered was performed on Ms. Ferguson.

107.     Records concerning the electrocardiogram results indicate that defendant Sammon requested the study due to reported "chest pain."

108.     Ms. Ferguson, however, had not reported any such pain; to the contrary, she specifically denied that she was experiencing any chest pain.

109.     At or about 12:24 p.m., defendant Rutland, having inserted a catheter into Ms. Ferguson, withdrew urine from her bladder.

110.     Pursuant to defendant Sammon's orders, a hospital staff member performed a urine pregnancy test and urine dip on Ms. Ferguson.

111.     In the afternoon hours of December 5, 2012, defendant Rutland, pursuant to defendant Sammon's orders and while accompanied by the CPB/ICE defendants, transported Ms. Ferguson to the Radiology Department for an abdominal X-ray study.

112.     The X-ray study revealed no foreign body within Ms. Ferguson's bowel.

113.     Despite the negative exam result, thereafter, Ms. Ferguson was subjected to a CT scan.

114.    As with the X-ray study, the CT scan revealed no drug packing or contraband in Ms. Ferguson's stomach, small bowel or large bowel.

115.    Subsequent testing of Ms. Ferguson's blood and urine also revealed no evidence of illegal drugs present in her body.

116.    Each of the invasive procedures forced upon Ms. Ferguson confirmed that there were no drugs in her system or concealed within her body.

117.    After awaking from her medication-induced sedation, Ms. Ferguson was not informed of what exactly had been done to her.

118.    Nor was Ms. Ferguson informed of the drugs that had been injected into her and how those drugs might affect her.

119.    Ms. Ferguson was held at the Hospital until well after 6:00 p.m. on December 5, 2012.

120.    All of the above-referenced medical personnel, including defendants Isenberg, Ghimire, Sammon, Chowdhury, Rutland, Traboscia and Does 6-10 conspired to deprive Ms. Ferguson of her liberty and to subject her to invasive and unnecessary medical testing and procedures without her consent.

121.    The CPB/ICE defendants encouraged and/or acquiesced in all actions by the above-referenced medical personnel to detain Ms. Ferguson and subject her to invasive and unnecessary medical testing and procedures without her consent.

122.    During all of the time she was confined at the Hospital, Ms. Ferguson did not eat. She was not permitted to contact anyone, including her family, an attorney or her employer, whom she wished to call to inform that she would be unable to report to work.

123.    Upon discharge from the Hospital, Ms. Ferguson was led to a law enforcement vehicle in which the CBP/ICE defendants transported her back to the airport.

124.    Once at the airport, Ms. Ferguson's luggage was returned to her and she was finally released, with neither an explanation nor an apology.

125.    Ms. Ferguson got into her car, which had been parked at the airport, and started to drive home.

126.    However, as a result of the trauma that she had suffered since deplaning in Philadelphia on December 4, 2012 and, upon information and belief, due to the medications administered to her at the Hospital, Ms. Ferguson had an accident while driving home from the airport.

127.    Ms. Ferguson's car crashed into a highway median and was significantly damaged in the collision.

128.    As a result of the car accident, Ms. Ferguson suffered physical injury and was transported from the scene of the accident.

129.    Ms. Ferguson's approximate day-long detention was unlawful because the CPB/ICE agents had no legal cause to inspect or detain her.

130.    There was no warrant issued for a search of Ms. Ferguson, and she never consented to any of the medical procedures or assessments to which she was subjected.

131.    The highly invasive medical procedures to which Ms. Ferguson was subjected for hours, without legal cause to support the necessity of such procedures under the circumstances, constituted unreasonable searches and seizure.

132.    At all relevant times, the actions and conduct of all defendants were carried out in willful, reckless, and callous disregard of Ms. Ferguson's rights under federal and state law.

133.     As a result of the conduct of all defendants, Ms. Ferguson suffered extraordinary

damages, including physical pain and suffering, loss of the enjoyment of life, loss of liberty,

embarassment and financial damages, some or all of which may be permanent.

134.     Additionally, Ms. Ferguson has suffered substantial emotional trauma, which may

be permanent and has resulted in physical symptoms, including difficulty sleeping, nightmares, a

racing heart, shortness of breath, anxiety and general nervousness.

## V.  CAUSES OF ACTION

### Count I
### Plaintiff LeaDawn Ferguson v. Defendant United States of America
### Federal Tort Claims Act – False Arrest/False Imprisonment

135.     Defendants Lamanski, Tandaric, Reynolds and Agent Does 1-5, without probable

cause and without Ms. Ferguson's consent, deprived Ms. Ferguson of her liberty by willfully

taking her into their custody, physically restraining her with handcuffs and shackles, transferring

her to the Hospital and causing her to remain detained at the Hospital for a prolonged period.

136.     Defendants' actions constitute the torts of false arrest and false imprisonment

under the laws of the Commonwealth of Pennsylvania.

137.     Under the Federal Tort Claims Act, defendant United States of America is liable

for these actions.

### Count II
### Plaintiff LeaDawn Ferguson v. Defendant United States of America
### Federal Tort Claims Act – Assault and Battery

138.     Defendants Lamanski, Tandaric, Reynolds and Agent Does 1-5, by their actions

in physically detaining Ms. Ferguson against her will, transferring her to the Hospital and

subjecting her to invasive medical examinations and testing, intended to place her in imminent

apprehension of harmful or offensive contact.  Such actions caused Ms. Ferguson imminent apprehension and, further, caused her to suffer harmful or offensive contacts.

139.    Defendants' actions constitute the torts of assault and battery under the laws of the Commonwealth of Pennsylvania.

140.    Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.

**Count III**
**Plaintiff LeaDawn Ferguson v. Defendant United States of America**
**Federal Tort Claims Act – Intentional Infliction of Emotional Distress**

141.    The conduct of defendants Lamanski, Tandaric, Reynolds and Agent Does 1-5 in physically detaining Ms. Ferguson against her will with handcuffs and shackles, subjecting her to invasive medical examinations and testing, and causing her to remain detained at the Hospital for a prolonged period, was outrageous and extreme. Defendants acted intentionally or in deliberate disregard of Ms. Ferguson's emotional distress; and, as a direct and proximate result, she suffered severe emotional distress which manifests itself in physical symptoms.

142.    Defendants' actions constitute the tort of intentional infliction of emotional distress under the laws of the Commonwealth of Pennsylvania.

143.    Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

**Count IV**
**Plaintiff LeaDawn Ferguson v. Defendant United States of America**
**Federal Tort Claims Act – Negligence**

144.    Defendants Lamanski, Tandaric, Reynolds and Agent Does 1-5 owed a duty to Ms. Ferguson, breached their duty to Ms. Ferguson, and, as such, were a direct and proximate cause and a substantial factor in bringing about Ms. Ferguson's damages outlined above.

145.   In particular, defendants violated their duty to Ms. Ferguson by:

    a.   Taking Ms. Ferguson into custody without legal cause;

    b.   Subjecting Ms. Ferguson to prolonged harassing interrogations and searches;

    c.   Transferring Ms. Ferguson to the Hospital for invasive searches and medical procedures notwithstanding the lack of legal cause to justify such searches and procedures;

    d.   Continuing to detain Ms. Ferguson for a prolonged period at the Hospital;

    e.   Preventing Ms. Ferguson from consulting with an attorney, despite her repeated requests;

    f.   Encouraging and/or demanding that Hospital staff involuntarily commit Ms. Ferguson in lieu of obtaining a lawful warrant and/or acquiescing in the decision of Hospital staff to do so;

    g.   Encouraging and/or demanding that Hospital staff engage in invasive testing and examinations of Ms. Ferguson and/or acquiescing in the decision of Hospital staff to do so and participating in such invasive testing and examinations; and

    h.   Encouraging and/or demanding that Hospital staff detain Ms. Ferguson for a prolonged period of time without legal cause and/or acquiescing in the decision of Hospital staff to do so.

146.   Defendants' actions constitute the tort of negligence under the laws of the Commonwealth of Pennsylvania.

147.   Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.

**Count V**
**Plaintiff LeaDawn Ferguson v. Defendant United States of America**
**Federal Tort Claims Act – Negligent Supervision, Hiring and Retention**

148.     Supervisory staff at CBP and ICE owed a duty of care to Ms. Ferguson to ensure

that CBP/ICE employees acted appropriately in carrying out their duties to enforce federal law.

149.     As evidenced by the unlawful and outrageous conduct of defendants Lamanski,

Tandaric, Reynolds and Agent Does 1-5, CBP/ICE supervisory staff violated their duty of care to

Ms. Ferguson by failing to properly supervise, retain and/or hire these defendants, and, as such,

CBP/ICE supervisory staff were a direct and proximate cause and a substantial factor in bringing

about Ms. Ferguson's damages.

150.     The actions of CBP/ICE supervisory staff constitute the torts of negligent hiring,

supervision and retention under the laws of the Commonwealth of Pennsylvania.

151.      Under the Federal Tort Claims Act, defendant United States of America is liable

for these actions.

**Count VI**
**Plaintiff LeaDawn Ferguson v. Defendants Lamanski, Tandaric, Reynolds, Agent Does 1-5,**
**Ghimire, Isenberg, Sammon, Chowdhury, Rutland, Traboscia and Does 6-10**
***Bivens* Claim – Fourth Amendment – Unlawful Seizure**

152.     The actions of defendants Lamanski, Tandaric, Reynolds and Agent Does 1-5 in

detaining Ms. Ferguson without consent or legal cause, and in subjecting her to a prolonged

detention at the Philadelphia International Airport and later at the Hospital resulted in an

unreasonable seizure in violation of her rights under the Fourth Amendment to the United States

Constitution.

153.     Defendants Ghimire, Isenberg, Sammon, Chowdhury, Rutland, Traboscia and

Does 6-10, by prolonging the detention of Ms. Ferguson without legal cause and without a

proper medical basis for subjecting her to extensive treatments and invasive examinations to

20

which she did not consent, acted in concert and conspiracy with the CPB/ICE defendants to unreasonably seize Ms. Ferguson in violation of her rights under the Fourth Amendment to the United States Constitution.

**Count VII**
**Plaintiff LeaDawn Ferguson v. Defendants Lamanski, Tandaric, Reynolds, Agent Does 1-5, Ghimire, Isenberg, Sammon, Chowdhury, Rutland, Traboscia and Does 6-10**
***Bivens* Claim – Fourth Amendment – Unlawful Search**

154.    The actions of defendants Lamanski, Tandaric, Reynolds and Agent Does 1-5 in searching Ms. Ferguson's person and property at the Philadelphia International Airport and in causing her to be subjected to invasive medical testing and examinations at the Hospital without legal cause and without her consent resulted in an unreasonable search in violation of Ms. Ferguson's rights under the Fourth Amendment to the United States Constitution.

155.    Defendants Ghimire, Isenberg, Sammon, Chowdhury, Rutland, Traboscia and Does 6-10, by conducting invasive medical testing and examinations without legal cause, without a proper medical basis and without Ms. Ferguson's consent, acted in concert and conspiracy with the CPB/ICE defendants to unreasonably search Ms. Ferguson in violation of her rights under the Fourth Amendment to the United States Constitution.

**Count VIII**
**Plaintiff LeaDawn Ferguson v. Defendants Lamanski, Tandaric, Reynolds, Agent Does 1-5, Ghimire, Isenberg, Sammon, Chowdhury, Rutland, Traboscia and Does 6-10**
***Bivens* Claim – Fifth Amendment – Due Process Violation**

156.    The actions of defendants Lamanski, Tandaric, Reynolds and Agent Does 1-5 in causing Ms. Ferguson to be subjected to invasive medical testing and examinations at the Hospital without her consent, which violated her rights to bodily integrity and privacy, were extreme and outrageous and shocking to the conscience and violated Ms. Ferguson's right to due process of law under the Fifth Amendment to the United States Constitution.

157.     Defendants Ghimire, Isenberg, Sammon, Chowdhury, Rutland, Traboscia and Does 6-10, by conducting invasive medical testing and examinations without Ms. Ferguson's consent, acted in concert and conspiracy with the CPB/ICE defendants in their extreme, outrageous and conscience-shocking conduct and violated her right to due process of law under the Fifth Amendment to the United States Constitution.

**Count IX**
**Plaintiff LeaDawn Ferguson v. Defendants Ghimire, Isenberg, Sammon, Chowdhury, Rutland, Traboscia, Does 6-10, Mercy Fitzgerald Hospital and Mercy Health System State Law Claim – False Arrest/False Imprisonment**

158.     Defendants Ghimire, Isenberg, Sammon, Chowdhury, Rutland, Traboscia, and Does 6-10**,** without legal cause and without Ms. Ferguson's consent, deprived Ms. Ferguson of her liberty by detaining her at the Hospital on the purported basis that she was a danger to herself, while disregarding willfully, recklessly or with gross negligence the fact that she did not require medical treatment.

159.     Defendants' actions constitute the torts of false arrest and false imprisonment under the laws of the Commonwealth of Pennsylvania.

160.     Defendants Mercy Fitzgerald Hospital and Mercy Health System are vicariously liable for these actions under the doctrine of *respondeat superior.*

**Count X**
**Plaintiff LeaDawn Ferguson v. Defendants Ghimire, Isenberg, Sammon, Chowdhury, Rutland, Traboscia, Does 6-10, Mercy Fitzgerald Hospital and Mercy Health System State Law Claim – Assault and Battery**

161.     Defendants Ghimire, Isenberg, Sammon, Chowdhury, Rutland, Traboscia, and Does 6-10, by their actions in physically detaining Ms. Ferguson against her will and causing her to be subjected to invasive medical examinations and testing, intended to place Ms. Ferguson in

imminent apprehension of harmful or offensive contact, caused Ms. Ferguson such imminent

apprehension, and caused her to suffer harmful or offensive contacts.

162.    Defendants' actions constitute the torts of assault and battery under the laws of

the Commonwealth of Pennsylvania.

163.    Defendants Mercy Fitzgerald Hospital and Mercy Health System are vicariously

liable for these actions under the doctrine of *respondeat superior*.

## Count XI
### Plaintiff LeaDawn Ferguson v. Defendants Ghimire, Isenberg, Sammon, Chowdhury, Rutland, Traboscia, Does 6-10, Mercy Fitzgerald Hospital and Mercy Health System State Law Claim – Intentional Infliction of Emotional Distress

164.    The conduct of defendants Ghimire, Isenberg, Sammon, Chowdhury, Rutland,

Traboscia, and Does 6-10 as described above was outrageous and extreme; these defendants

acted intentionally or in deliberate disregard of Ms. Ferguson's emotional distress; and, as a

direct and proximate result, Ms. Ferguson suffered severe emotional disress which manifests

itself in physical symptoms.

165.    Defendants' actions constitute the tort of intentional infliction of emotional

distress under the laws of the Commonwealth of Pennsylvania.

166.    Defendants Mercy Fitzgerald Hospital and Mercy Health System are vicariously

liable for these actions under the doctrine of *respondeat superior*.

## Count XII
### Plaintiff LeaDawn Ferguson v. Defendants Ghimire, Isenberg, Sammon, Chowdhury, Rutland, Traboscia, Does 6-10, Mercy Fitzgerald Hospital and Mercy Health System State Law Claim – Negligence

167.    Defendants Ghimire, Isenberg, Sammon, Chowdhury, Rutland, Traboscia, and

Does 6-10 owed a duty of reasonable care to Ms. Ferguson, breached their duty to Ms. Ferguson,

and, as such, were direct and proximate causes and substantial factors in bringing about Ms. Ferguson's damages outlined above.

168.    In particular, defendants violated their duty to Ms. Ferguson by:

a.  Detaining Ms. Ferguson for a prolonged period at the Hospital on the purported basis that she was a danger to herself notwithstanding the lack of any medical evidence supporting that conclusion;

b.  Conducting invasive testing, procedures and examinations in violation of generally accepted standards of care and without Ms. Ferguson's consent;

c.  Conducting invasive testing, procedures and examinations without knowledge of Ms. Ferguson's medical history and without informing her of the effects that such procedures and examinations would have on her;

d.  Allowing the CBP/ICE defendants to observe and participate in the invasive testing, procedures and examinations, without Ms. Ferguson's consent, and in violation of generally accepted standards of care; and

e.  Assisting the CBP/ICE defendants in their investigation of Ms. Ferguson's allegedly unlawful conduct in such a way as to obviate the need for the CBP/ICE defendants to follow legally required procedures, including the obtaining of a warrant, to conduct such investigations.

169.    Defendants' actions constitute the tort of negligence under the laws of the Commonwealth of Pennsylvania.

170.    Defendants Mercy Fitzgerald Hospital and Mercy Health System are vicariously liable for these actions under the doctrine of *respondeat superior*.

**Count XIII**
**Plaintiff LeaDawn Ferguson v.**
**Defendant Mercy Fitzgerald Hospital and Mercy Health System**
**State Law Claim – Negligent Supervision, Hiring and Retention**

171.    Mercy Fitzgerald Hospital and Mercy Health System owed a duty of reasonable care to Ms. Ferguson to ensure that its employees acted appropriately in carrying out their duties to provide medical care.

172.    As evidenced by the conduct of defendants Ghimire, Isenberg, Sammon, Chowdhury, Rutland, Traboscia, and Does 6-10, defendants Mercy Fitzgerald Hospital and Mercy Health System violated their duty of care to Ms. Ferguson in failing to properly supervise, retain and/or hire these defendants, and, as such, defendants Mercy Fitzgerald Hospital and Mercy Health System were direct and proximate causes and substantial factors in bringing about Ms. Ferguson's damages.

173.    The actions of Mercy Fitzgerald Hospital and Mercy Health System constitute the torts of negligent hiring, supervision and retention under the laws of the Commonwealth of Pennsylvania.

**Count XIV**
**Plaintiff LeaDawn Ferguson v. Defendants Ghimire, Isenberg, Sammon, Chowdhury,**
**Rutland, Traboscia, and Does 6-10**
**State Law Claim – Civil Conspiracy**

174.    Defendants Ghimire, Isenberg, Sammon, Chowdhury, Rutland, Traboscia, and Does 6-10 jointly agreed to commit the unlawful acts against Ms. Ferguson as outlined above and did commit one or more unlawful acts in furtherance of that agreement in depriving her of legal rights.

175.    The actions of Ghimire, Isenberg, Sammon, Chowdhury, Rutland, Traboscia, and Does 6-10 constitute a civil conspiracy under the laws of the Commonwealth of Pennsylvania.

**Wherefore**, plaintiff LeaDawn Ferguson respectfully requests:

    A.     Compensatory damages as to all defendants;

    B.     Punitive damages as to defendants Lamanski, Tandaric, Reynolds, Agent Does 1-

           5, Ghimire, Isenberg, Sammon, Chowdhury, Rutland, Traboscia, Does 6-10,

           Mercy Fitzgerald Hospital and Mercy Health System;

    C.     Reasonable attorneys' fees and costs as to all defendants;

    D.     Such other and further relief deemed just and appropriate.

Plaintiff hereby demands a jury trial as to Counts VI through XIV.

Jonathan H. Feinberg
I.D. No. 88227
KAIRYS, RUDOVSKY, MESSING & FEINBERG
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400
(215) 925-5365 (fax)
jfeinberg@krlawphila.com

Jennie Santos-Bourne
(*Pro Hac Vice* Admission Pending)
AMERICANS FOR IMMIGRANT JUSTICE
3000 Biscayne Blvd., Suite 400
Miami, FL 33137
(305) 573-1106 Ext. 1080
(305) 576-6273 (fax)
jsantos@aijustice.org

*Counsel for Plaintiff*