IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEADAWN FERGUSON, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | No. 14-6807 |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, *et al.*, | : | |
| Defendants. | : | |

April 18, 2016                                                                                          Anita B. Brody, J.

## MEMORANDUM

Plaintiff Leadawn Ferguson brings suit against the United States, several Customs and Border Protection Officials ("collectively, the "CBP Defendants"),[1] Mercy Fitzgerald Hospital ("Mercy" or the "Hospital"), several Mercy employees (collectively, the "Hospital Employee Defendants"),[2] and Mercy Health System for alleged violations of federal and state law. Pl.'s Am. Compl., ECF No. 30.[3] I exercise federal question jurisdiction over Ferguson's FTCA and

---

[1] Specifically, Ferguson brings suit against the following Customs and Border Protection Officials: Officers Stephen Lemanski, Theresa Tandaric, Rik Reynolds, and Kathleen Brown; Supervisory Officer Michael Gulkis; and Duty Chief Robert Heiss.

[2] Specifically, Ferguson brings suit against Hospital employees Dr. Derek L. Isenberg, Dr. Maura E. Sammon, Nurse Tara Chowdhury, Nurse Stacey Rutland, and Nurse Natalie Traboscia.

[3] The Amended Complaint contains the following fourteen causes of action against various defendants:
  Count I: False Arrest/False Imprisonment against the United States under the Federal Tort Claims Act ("FTCA");
  Count II: Assault and Battery against the United States under the FTCA;
  Count III: Intentional Infliction of Emotional Distress against the United States under the FTCA;
  Count IV: Negligence against the United States under the FTCA;
  Count V: Negligent Supervision, Hiring, and Retention against the United States under the FTCA;
  Count VI: Unlawful Seizure in violation of the Fourth Amendment against the CBP Defendants and the Hospital Employee Defendants under *Bivens*;
  Count VII: Unlawful Search in violation of the Fourth Amendment against the CBP Defendants and the Hospital Employee Defendants under *Bivens*;
  Count VIII: Violation of Fifth Amendment Due Process against the CBP Defendants and the Hospital Employee Defendants under *Bivens*;

1

*Bivens* claims pursuant to 28 U.S.C. §§ 1331 and 1346(b), and supplemental jurisdiction over Ferguson's state law claims pursuant to 28 U.S.C. § 1367. The Hospital Employee Defendants now move to dismiss[4] Counts VI, VII, and VIII of the Amended Complaint.[5] *See* ECF No. 34. For the reasons set forth below, I will deny the motion to dismiss without prejudice to raise the issue at summary judgment.

## I. BACKGROUND

Leadawn Ferguson is a 36 year-old African-American United States citizen. Am. Compl. ¶ 1. In December 2012, she traveled to Punta Cana, Dominican Republic for a brief vacation. *Id.* ¶ 39. On December 4, 2012, Ferguson returned to the United States through the Philadelphia International Airport (the "Airport"). *Id.* ¶ 39. After she proceeded through customs and retrieved her luggage, Ferguson was stopped by a uniformed officer. *Id.* ¶¶ 43-44. The officer examined her documentation and, without explanation, sent her to a second screening area where she was interrogated by several CBP Defendants, including Officer Lemanski. *Id.* ¶¶ 41, 45. During the interrogation, the CBP Defendants examined Ferguson's personal belongings and searched her luggage and purse. *Id.* ¶ 48. They told Ferguson that they suspected her of

---

      Count IX: False Arrest/Imprisonment against the Hospital Employee Defendants in violation of Pennsylvania law;
      Count X: Assault and Battery against the Hospital Employee Defendants in violation of Pennsylvania law;
      Count XI: Intentional Infliction of Emotional Distress against the Hospital Employee Defendants in violation of Pennsylvania law;
      Count XII: Negligence against the Hospital Employee Defendants in violation of Pennsylvania law;
      Count XIII: Negligent Supervision, Hiring, and Retention against Mercy and Mercy Health System in violation of Pennsylvania law;
      Count XIV: Civil Conspiracy against the Hospital Employee Defendants in violation of Pennsylvania law.
Am. Compl., ECF No. 30.

[4] Dr. Raj K. Ghimire, another Hospital Employee Defendant named in Ferguson's Amended Complaint, initially joined in the motion to dismiss, but was dismissed from this action on January 29, 2016. *See* ECF No. 54.

[5] Although Ferguson brings Counts VI, VII, and VIII against both the Hospital Employee Defendants and the CBP Defendants, only the Hospital Employee Defendants move to dismiss Counts VI, VII, and VIII. *See* ECF No. 34.

transporting drugs into the United States. *Id.* ¶ 49. Ferguson denied transporting drugs, and explained that she had traveled to the Dominican Republic for a brief vacation. *Id.* ¶¶ 50, 39.

Despite Ferguson's statements, the CBP Defendants continued to interrogate her. *Id.* ¶ 47. They asked Ferguson to submit to a pat down. *Id.* ¶ 52. When she refused, she was told that she was not under arrest but that she could not leave the Airport. *Id.* ¶¶ 53-55. After the CBP Defendants told her that she would be released if she consented to a pat down, Ferguson agreed to submit to a pat down. *Id.* ¶¶ 56-57. She was taken to a small room, where CBP Defendant Tandaric administered the pat down. *Id.* ¶ 58. Tandaric did not find any drugs or contraband on Ferguson, but did not permit her to leave the room. *Id.* ¶¶ 58-60. Instead, the CBP Defendants resumed their interrogation. *Id.* ¶ 61. Throughout the interrogation, Ferguson repeatedly asked to contact an attorney. *Id.* ¶ 62. The CBP Defendants denied her requests. *Id.* The interrogation at the Airport lasted approximately seven hours. *Id.* ¶ 64.

At some point during the interrogation, the CBP Defendants decided to seek Ferguson's consent to take her to a hospital and use medical equipment to search her body for drugs. *Id.* ¶¶ 63-64. Ferguson again refused to give her consent without first speaking with an attorney. *Id.* ¶ 66. The CBP Defendants, including Lemanski and Tandaric, continued to deny Ferguson's request to speak with an attorney and refused to let her leave the Airport. *Id.* ¶ 67. Instead, they placed Ferguson in handcuffs and shackles, dragged her to an Airport exit, positioned her in the back seat of a marked law enforcement vehicle, and transported her to Mercy Fitzgerald Hospital in Darby, Pennsylvania, approximately twenty minutes away from the Airport. *Id.* ¶¶ 69-71. They arrived at the Hospital at around 3:24 a.m. on the morning of December 5, 2012. *Id.* ¶73.

The CBP Defendants, including Lemanski andTandaric, removed Ferguson from the vehicle and brought her into the Hospital. *Id.* ¶ 72. Ferguson remained handcuffed and

shackled. *Id.* ¶ 72. CBP Defendants Lemanski, Tandaric, and Gulkis spoke with the Hospital staff and suggested that Ferguson was "body packing," or transporting drugs inside of her body. *Id.* ¶ 75. The CBP Defendants "provided false and misleading information to the Hospital suggesting that [] Ferguson was 'body packing' and/or acquiesced in the conclusion of Hospital medical staff that [] Ferguson was 'body packing.'" *Id.* ¶ 75. Hospital Employee Defendant Traboscia, who was working as a triage nurse at the time, then assessed Ferguson. *Id.* ¶ 76. Traboscia recorded that Ferguson was refusing medical treatment. *Id.* ¶ 78. Traboscia also noted that Ferguson did not appear to display any of the symptoms associated with "body packing," such as difficulty breathing, neurological deficits, or incoherent speech. *Id.* ¶ 77. Despite Traboscia's observations, the Hospital staff admitted Ferguson into the Hospital, secured her in a room, and conducted various tests on her body. At no point during her detention at the Hospital did the CBP Defendants obtain a warrant to detain Ferguson in the room, search her body, or perform any medical examinations on her. *Id.* ¶ 85.

First, the CBP Defendants and the Hospital Employee Defendants asked Ferguson to sign a medical consent form authorizing medical treatment and services. *Id.* ¶ 79. Ferguson refused. *Id.* ¶ 80. When Ferguson refused to give her consent, Hospital staff placed her in an inpatient room guarded by CBP Defendants, including Lemanski and Tandaric. *Id.* ¶¶ 81-83. At some point later on, Reynolds and Brown replaced Lemanski and Tandaric. *Id.* ¶ 83. They directed Ferguson to provide a urine and fecal sample in their presence, and told her that she would be kept in the room until she complied. *Id.* ¶ 84. CBP Defendants remained in the room with Ferguson and outside of the room's entrance at all times. *Id.* ¶ 82.

Ferguson remained in the Hospital room for several hours. *Id.* ¶ 87. While she was there, the Hospital assigned Hospital Employee Defendants Isenberg and Chowdhury to assess

her. *Id.* ¶ 86. Isenberg and Chowdhury were aware that Ferguson had refused medical treatment and that she had not presented symptoms consistent with "body packing." *Id.* ¶ 88. Isenberg and Chowdhury were also aware that the CBP Defendants did not have a warrant permitting them or the Hospital Employee Defendants to detain, X-ray, examine, or otherwise search Ferguson. *Id.* ¶¶ 88-89. At some point while she was held in the Hospital room, Ferguson overheard a Hospital employee express concern about the CBP Defendants' lack of a warrant and state that the staff could not examine or perform an X-ray on her without her consent. *Id.* ¶ 87. Nevertheless, Isenberg and Chowdhury did not release her from the Hospital. *Id.* ¶ 90.

During the morning of December 5, 2012, Dr. Raj K. Ghimire and Hospital Employee Defendants Sammon and Rutland assumed responsibility for Ferguson's care. *Id.* ¶ 91. Rutland tried to discuss Ferguson's medical status in the presence of the CBP Defendants. *Id.* ¶ 92. Ferguson refused to discuss her medical status with Rutland or be assessed by her in the presence of the CBP Defendants. *Id.* ¶ 93. She explained to Rutland that the CBP Defendants had been holding her against her will for hours. *Id.* Based on her assessment, Rutland concluded that Ferguson was exhibiting signs of an elevated heart rate, called tachycardia. *Id.* ¶ 94. As a result, Ferguson was admitted to the Hospital due to tachycardia and "possible drug toxicity." *Id.* ¶ 96.

Once she was admitted, Ferguson was assessed by Sammon. *Id.* ¶ 97. Sammon told Ferguson that she wanted to examine her due to her elevated heart rate. *Id.* Ferguson explained to Sammon that her heart rate was elevated because of the stress she had experienced from being detained, and because she had not slept, eaten, or had anything to drink for many hours. *Id.* ¶ 98. Sammon also spoke with the CBP Defendants, who told her that they were in the process of obtaining a warrant to examine Ferguson and search her body. *Id.* ¶ 99. Sammon noted in Ferguson's medical chart that she was permitted to refuse medical treatment because the CBP

5

Defendants had not yet obtained a warrant. *Id.* ¶ 100. The CBP Defendants never obtained a warrant. *Id.* ¶ 101. Instead, they asked Sammon to involuntarily commit Ferguson in order to avoid the need to obtain a warrant. *Id.* ¶ 104. At some point that day, Sammon involuntarily committed Ferguson, claiming that she presented a harm to herself. *Id.* ¶ 102.

After Sammon involuntarily committed Ferguson, she determined that she and other Hospital staff could examine Ferguson and provide emergency treatment. *Id.* ¶ 105. Hospital staff entered the room where Ferguson was being held, tied her down to a hospital bed using restraints, and then left. *Id.* ¶¶ 106-07. A female Hospital staff member then entered the room and, in the presence of a male CBP Defendant, forcefully cut off all of Ferguson's clothes from her body. *Id.* ¶ 107. The male CBP Defendant then conducted a close visual inspection of Ferguson's naked, restrained body, including her vulva and vagina. *Id.* ¶ 108. When Ferguson asked him to stop and leave the room, he responded, "I have daughters," and refused to leave or look away. *Id.* ¶ 109. Sammon and Rutland then conducted a physical examination of Ferguson, which involved removing a tampon from her vagina. *Id.* ¶ 110.

Sammon directed Rutland to insert an IV into Ferguson and administer two medications intravenously: lorazepam, a sedative, and olanzapine, an anti-psychotic. *Id.* ¶¶ 111-14. Sammon and Rutland administered these medications without obtaining Ferguson's consent, medical history, or current medication information, and did not advise or warn Ferguson about the medications' risks or effects. *Id.* ¶¶ 118-19. As a result of the sedative and anti-psychotic drugs, Ferguson became sedated and disoriented. *Id.* ¶ 115.

The Hospital staff, on Sammon's orders, then performed a battery of tests on Ferguson. *Id.* ¶ 120. First, the staff performed an electrocardiogram study. *Id.* ¶ 122. Sammon requested the study by noting that Ferguson had reported chest pain even though Ferguson denied ever

experiencing any chest pain or reporting it to Sammon. *Id.* ¶ 122-23. Next, Rutland inserted a catheter into Ferguson and withdrew urine from her bladder. *Id.* ¶ 124. Rutland and the CBP Defendants then transported Ferguson to the Radiology Department and conducted an X-ray of her abdomen. *Id.* ¶ 126. Although the X-ray was negative for foreign objects, the staff proceeded to conduct a CT scan of Ferguson. *Id.* ¶¶ 127-28. In addition to the electrocardiogram, abdominal X-ray, and CT scan, the Hospital staff administered a number of tests on Ferguson's urine and blood, including a pregnancy test. *Id.* ¶¶ 125, 130. Every test was negative for illegal substances, and none of the medical procedures revealed the presence of any foreign objects inside of Ferguson's body. *Id.* ¶ 131.

When Ferguson awoke from the sedative medication, she was not informed of the procedures she had been subjected to, nor was she told about the drugs that had been administered to her intravenously or about their effects. *Id.* ¶¶ 132-33. At 6:00 p.m. on December 5, 2012, approximately twenty-four hours after she was first detained at the Airport, Ferguson was permitted to leave the Hospital. *Id.* ¶ 134. The CBP Defendants, including Reynolds and Brown, led her to a law enforcement vehicle, transported her to the Airport, returned her luggage, and released her. *Id.* ¶¶ 138-39. Ferguson then went to her car and proceeded to drive to her home in Maryland. *Id.* ¶ 140. En route to her home, however, she crashed into a highway median. *Id.* ¶¶ 141-42. As a result of the crash, her car was damaged and she suffered physical injuries. *Id.* ¶ 143.

Ferguson brought suit against the United States, the CBP Defendants, Mercy, the Hospital Employee Defendants, and Mercy Health System for her physical and emotional injuries arising from her detention, seizure, search, exposure to nonconsensual medical procedures, and car accident. Am. Compl., ECF No. 30. On June 1, 2015, the Hospital

Employee Defendants filed a partial motion to dismiss Ferguson's *Bivens* claims against them, Counts VI, VII, and VIII of the Amended Complaint. ECF No. 34.

## II.     LEGAL STANDARD

In deciding a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citation omitted) (internal quotation marks omitted).

To survive dismissal, a complaint must allege facts sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (citation omitted) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. However, an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered . . . ." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis omitted) (citations omitted) (internal quotation marks omitted). Thus, a court may "consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994).

Further, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

## III.   DISCUSSION

Ferguson brings suit against the Hospital Employee Defendants under *Bivens* for unlawful search in violation of the Fourth Amendment (Count VI), unlawful seizure in violation of the Fourth Amendment (Count VII), and violation of the Due Process Clause of the Fifth Amendment (Count VIII).

In *Bivens v. Six Unknown Federal Narcotics Agents*, the Supreme Court recognized a private right of action for damages against federal officers who violate a citizen's Fourth Amendment rights. 403 U.S. 388 (1971). Unlike a private citizen, "an agent acting – albeit unconstitutionally – in the name of the United States possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own." *Id.* at 392. Although the Court acknowledged that the United States Constitution did not explicitly provide for enforcement through private damages actions, it reasoned that "where federally protected rights have been invaded . . . courts will be alert to adjust their remedies so as to grant the necessary relief." *Id.* at 392 (citation omitted) (internal quotation marks omitted). Finding no "special factors counseling hesitation," *id.* at 396, the Court created "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001) (discussing *Bivens*).

Following *Bivens*, the Supreme Court has explicitly recognized actions for damages under specific circumstances against federal actors who abuse their constitutional authority. *See Carlson v. Green*, 446 U.S. 14 (1980) (recognizing an implied damages remedy under the Cruel

and Unusual Punishments Clause of the Eighth Amendment); *Davis v. Passaman*, 442 U.S. 228 (1979) (recognizing an implied damages remedy against federal actors for violations of the Due Process Clause of the Fifth Amendment).[6]

"A *Bivens* action . . . will lie where the defendant has violated the plaintiff's rights under color of federal law."[7] *Brown v. Philip Morris Inc.*, 250 F.3d 789, 800 (3d Cir. 2001) (citation omitted). Accordingly, to establish a claim for relief under *Bivens*, a plaintiff must demonstrate: (1) that the conduct was committed by a federal actor, and (2) that the plaintiff was deprived of a right secured by the Constitution or federal laws as a result. *See id.* at 801 (citation omitted).

A private party may be considered a federal actor under certain circumstances. *Brown*, 250 F.3d 801. In *Brown*, the Third Circuit explained that "in order to determine whether the conduct of a private party should be attributed to the federal government, courts apply the 'state action' analysis" established by the Supreme Court in the § 1983 context. *Brown*, 250 F.3d at 801. "The object of the inquiry is to determine whether . . . the defendant exercised power possessed by virtue of [federal] law and made possible only because the wrongdoer is clothed in the authority of [federal] law." *Id.* (alteration in original) (citation omitted) (internal quotation marks omitted).

---

[6] *But see Minneci v. Pollard*, 132 S. Ct. 617 (2012) (declining to recognize an implied damages remedy against private prison employees for alleged Eighth Amendment violations at a privately operated federal prison when state tort remedies provided "roughly similar incentives" to deter the unconstitutional conduct); *Malesko*, 534 U.S. 61 (2001) (declining to recognize an implied damages action against a private prison corporation for alleged Eighth Amendment violations at the private prison facility); *Bush v. Lucas*, 462 U.S. 367 (1983) (declining to recognize an implied damages action against individual federal actors for First Amendment violations in the federal employment context).

[7] "[W]here *Bivens* does apply, the implied cause of action is the federal analog to suits brought against state officials under . . . 42 U.S.C. § 1983." *Iqbal*, 556 U.S. at 675-76 (citation omitted) (internal quotation marks omitted). Thus, a *Bivens* action is "the federal equivalent of the § 1983 cause of action against state actors." *Brown v. Philip Morris Inc.*, 250 F.3d 789, 800 (3d Cir. 2001); *see also Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir. 1995) (per curiam) (noting that "federal courts have typically incorporated § 1983 law into *Bivens* actions" because "the two actions share the same practicalities of litigation" (citation omitted) (internal quotation marks omitted)).

Under Third Circuit precedent, a private party's conduct must satisfy one of three theories of federal action in order to be considered a federal actor: (1) the "public function" test, requiring that the private party perform a traditionally public function that is the "exclusive prerogative" of the government; (2) the "close nexus" test, requiring the government to exercise "coercive power" or "significant encouragement" over the private party; or (3) the "symbiotic relationship" test, requiring the government to have "insinuated itself into a position of interdependence" with the private party. *Brown*, 250 F.3d at 801 (applying the § 1983 state action analysis set forth in *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937-42 (1982)).

The Hospital Employee Defendants move to dismiss Ferguson's *Bivens* claims against them because they are private individuals who cannot be sued under *Bivens*. The Hospital Employee Defendants are doctors and nurses who work for the Hospital. Although they are private individuals whose employment is unaffiliated with the federal government, Ferguson alleges that they acted in concert with the CBP Defendants to deprive her of her constitutional rights. Therefore, under *Brown*'s federal action analysis, the relationship between the federal officials and the private parties at issue here can be addressed under the "close nexus" test.

The "close nexus" test will be satisfied when the government "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government]." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999) (citation omitted) (quotation marks omitted). The "close nexus" test requires the government actor to "compel, influence or encourage" the unconstitutional conduct by the private party. *Brown*, 250 F. 3d at 802; *see also Max v. Republican Comm. of Lancaster Cty.*, 587 F. 3d 198, 203 (3d Cir. 2009) (noting that "a private party can be liable under § 1983 if he or she willfully participates in a joint conspiracy with state officials to deprive a person of a

11

constitutional right"). However, "[a]ction taken by private entities with the mere approval or acquiescence of the [government] is not [federal] action." *Sullivan*, 526 U.S. at 52 (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982)).

Taking Ferguson's factual allegations as true, the *Bivens* claims against the Hospital Employee Defendants for alleged violations of the Fourth and Fifth Amendments are plausible under the "close nexus" test. Ferguson's allegations, if true, chronicle a harrowing saga, in which Hospital doctors, nurses, and federal officers worked together to deprive a citizen of her rights by detaining her for hours, violating her bodily integrity, and subjecting her to medical procedures absent any apparent medical need. The Officers not only transported, guarded, and observed Ferguson while she was in the care of the Hospital Employee Defendants, but also conferred with the doctors and nurses to admit her to the Hospital, search her body, and involuntarily commit her in order to administer medication and perform invasive medical procedures against her will and without a warrant. Specifically, Ferguson alleges that a male CBP Defendant conducted a close visual inspection of Ferguson's body, after Hospital staff forcibly restrained her and removed her clothing, and immediately before Hospital staff conducted their own invasive physical examination; and that CBP Defendants consulted with Hospital Employee Defendants about involuntarily committing Ferguson to avoid obtaining a warrant. These allegations, if proven, point to the sort of compulsion, influence, and encouragement needed to satisfy the "close nexus" test for federal action.

The Hospital Employee Defendants move to dismiss Ferguson's *Bivens* claims against them. Notwithstanding this Circuit's decision in *Brown*, they argue that they cannot be sued under *Bivens* because they are private individuals. In support of this position, they rely exclusively on the Supreme Court's holding in *Minneci v. Pollard*. 132 S. Ct. 617 (2012). In

*Minneci*, the Supreme Court declined to recognize a *Bivens* action when a private prison employee, working at a privately operated federal prison, allegedly violated the Eighth Amendment rights of a federal prisoner housed there. *Id.* at 626. The Court declined to recognize a *Bivens* action on the grounds that the state tort remedies available to the prisoner in that case were adequate to provide "roughly similar incentives" to deter the unconstitutional conduct of the private prison personnel. *Id.* at 623-25. The Hospital Employee Defendants' position rests on the assumption that the Court's holding in *Minneci* abrogates *Brown* and stands for the broad proposition that a *Bivens* action can never be asserted against private individuals in any context.

The holding of *Minneci*, however, is consistent with *Brown*'s federal action analysis for *Bivens* claims against private parties. The *Minneci* decision neither addresses the federal action analysis, nor the three methods for establishing federal action – the public function test, close nexus test, or symbiotic relationship test – recognized in *Brown*.[8] The type of relationship between federal officials and private parties contemplated by the "close nexus" test was irrelevant to the facts at issue in *Minneci*. The case did not involve claims that government officials were involved in any way with the private prison employees who committed the alleged Eighth Amendment violations, or that the private prison personnel committed the alleged constitutional violations because they were compelled, influenced, or encouraged to by federal officials.

---

[8] In fact, the *Minneci* Court's only reference to the concept of federal action is its mention of the Court's rejection, in an earlier case, of the argument that a private prison corporation is a "federal agent." *See Minneci*, 132 S. Ct. at 623 (comparing *Malesko*, 534 U.S. at 70 n.4 with *id.* at 76-77 (Stevens, J., dissenting)). The Court did not discuss the "public function" test – the most likely source of "federal action" based on the facts of that case – or explain whether its holding impacted the "public function" test in the *Bivens* context generally. The outcome of *Minneci* may, however, suggest that the applicability of the "public function" test for federal action to *Bivens* claims, at least in the Eighth Amendment private prison context, has been narrowed. Alternatively, it may reflect the fact that the "public function" test is considered "the most rigorous of the inquiries" for federal action. *Brown*, 250 F.3d at 802 (discussing the "high standard" for the "public function" test addressed by the Supreme Court in *Blum*, 457 U.S. at 1004-05).

Moreover, the *Minneci* Court emphasized that the holding was narrow and limited in scope:

> [W]here . . . a federal prisoner seeks damages from privately employed personnel working at a privately operated federal prison, where the conduct allegedly amounts to a violation of the Eighth Amendment, and where that conduct is of a kind that typically falls within the scope of traditional state tort law . . . the prisoner must seek a remedy under state tort law.

132 S. Ct. at 626. *Minneci* explicitly leaves "different cases and different state laws to another day." *Id.*[9] The Court explained: "[W]e can decide whether to imply a *Bivens* action in a case where an Eighth Amendment claim or state law differs significantly from those at issue here when and if such a case arises." *Id.* Other district courts have read the *Minneci* holding narrowly. *See, e.g.*, *Espinoza v. Zenk*, No. 10-427, 2013 WL 1232208, at *7-9 (E.D.N.Y. Mar. 27, 2013) (collecting cases and concluding that the *Minneci* holding only bars Eighth Amendment claims against private prison employees). Despite the Hospital Employee Defendants' arguments to the contrary, the *Minneci* decision itself suggests that it should be construed narrowly.

Given the absence of any discussion of the "close nexus" test and the explicitly narrow scope of the holding, *Minneci* simply fails to undermine the Third Circuit's "close nexus" test. *See Poulis v. State Farm Fire and Cas. Co.*, 747 F. 2d 863, 867 (3d Cir. 1984) ("If the judges of [the Third Circuit] are bound by earlier panels, *a fortiori* district court judges are similarly bound. Recognition of the hierarchical nature of the federal judiciary requires no less.").

As discussed above, Ferguson's allegations, if true, demonstrate that the CBP Defendants worked with and encouraged the Hospital Employee Defendants to detain, admit, examine, and

---

[9] Indeed, the *Minneci* Court characterized its prior decision in *Bivens* as standing for the proposition that "state tort law [is] 'inconsistent or even hostile' to Fourth Amendment" violations. *Id.* at 624 (quoting *Bivens*, 403 U.S. at 394). This suggests that the approach of *Minneci* – requiring a close reading of the facts of the case and an examination into the relevant state tort remedies available to a federal prisoner for certain Eighth Amendment violations – may be wholly inapplicable to *Bivens* claims for Fourth Amendment violations.

involuntarily commit Ferguson to the Hospital, and perform invasive medical tests on her body, all without medical justification and without a warrant. The conduct Ferguson alleges was conducted by private parties who acted in concert with the federal actors. Ferguson has pled facts more than sufficient to withstand the Hospital Employee Defendants' partial motion to dismiss. The Hospital Employee Defendants' motion will be denied without prejudice to raise the issue at the conclusion of discovery, when the parties will have the benefit of a fuller record.

## IV. CONCLUSION

For the reasons discussed above, the Hospital Employee Defendants' partial motion to dismiss (ECF No. 34) will be denied without prejudice to raise the issue at summary judgment.

                                                  **s/Anita B. Brody**

                                        _____
                                        ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:                     Copies **MAILED** on _____ to: